May it please the Court, I'm Nancy Hamron with the firm of Code Rose representing George Kaleh. Kaleh, thank you. I intend to discuss two issues here today and they both relate to the statute of limitations. It's Mr. Kaleh's position that both statutes should be applied in this case in his favor and would bar Western-Southern's cause of action. Those two statutes are the Texas Property Code, Section 51.003A, which essentially says that a creditor that forecloses on real property, which secures an indebtedness, must file suit against anybody that's liable on that indebtedness, whether it be a debtor or a guarantor, within two years of the date of foreclosure. The second statute of limitations is Texas Civil Practices and Remedies Code, Section 16.004A3, which is the four-year statute for suits on a debt, suits on contracts. That statute accrues when the creditor has the right to bring in action, his cause of action. I'm going to start off with 51.003A. It's Mr. Kaleh's position that because the operative facts are as follows, the foreclosure of the real property which secured the two notes occurred on December 1st, 2009. The suit was not filed until June of 2013, clearly more than two years from the date of foreclosure. It is for that reason that we believe that that statute bars Western Southern's cause of action. Judge Hittner held early on before the trial started that because the guarantee agreements that Mr. Kaleh signed provided that Ohio law would apply, Judge Hittner held that Ohio law would apply to the substantive issues in this case, but that because the suit was filed in Texas under Texas conflicts of law analysis that the procedural law of the forum, Texas procedural law, would apply. Texas procedural law also includes its statute of limitations, but Judge Hittner then held that the Section 51.003A of the Texas and held that it was a substantive statute of limitations. He cited a case, the Hill versus Perez case, which announced or basically set forth the rule of when a statute of limitations is considered substantive versus procedural. And in that court, in that case, the court held that when the very statute that creates the limitations also creates the cause of action itself, then the statute of limitations is substantive. But the Hill case actually held, and what happened in Hill was there was a car accident in California, and the injured person filed suit in Texas. In Hill, the court held that while substantive law of California would apply to the negligence cause of action, the Texas statute of limitations would apply because negligence was nothing more than a common law cause of action. We think that Judge Hittner misinterpreted Hill and misinterpreted 51.003A. 51.003A, Judge Hittner stated, found that it created the cause of action, the right to sue for a deficiency. It does no such thing. All it does is create a two-year limitations rather than what was formerly a four-year limitations and provides for an additional offset right to a debtor if the debtor believes that the lender did not bid in the full fair value of the property at the foreclosure. But the right to sue for deficiency has been around since the 1800s, and there's several Texas cases which discuss that. In fact, the Trunk Hill case from 1995 out of the Waco Court of Appeals specifically said that the we cited that case in our proposed findings of fact and conclusions of law and argued that case to Judge Hittner, but he never addressed it one way or the other. It's not in any of his findings or conclusions. We think with all due respect to Judge Hittner is he just missed that case. Assuming that you're correct and that the limitations period does apply in two years, it seems like there might be different answers based for the different guarantees. Your Honor, in the South Court, the South Court said that 51003A does apply to guarantors because they are a person that is liable for the indebtedness that is discussed in 51003A. So it would apply for the construction guarantee with the two years, right? You want it to do that, right? Correct. But what about the completion guarantee and the mezzanine guarantee? It seems that those maybe have different limitations periods. Can you help us with that? Yes, I can, understanding Your Honor's question. The real question is the mezzanine guarantee was the indebtedness under the mezzanine loan, which is what the mezzanine guarantee guaranteed, was that secured by the real property because 51003A applies to indebtedness that is secured by the real property. And in response to that, I would say, yes, it was secured by the real property under the documents themselves, which I will get to in just a second. But I will also say that that issue was not specifically addressed in Judge Hittner's findings or conclusions because it was an issue that had been disposed of already. And by that, what I mean is Western Southern, in their pretrial order, which was filed prior to trial, specifically stated the construction loan promissory note and the mezzanine loan promissory note were each secured by a deed of trust. They've admitted that, they've stipulated to that in the record. So you think they rise or fall together? The construction loan guarantee and the mezzanine, yes, yes, I do, Your Honor. They stipulated that Texas law, that Texas law would cover procedural. Judge Hittner found that Texas law would cover procedure. I don't think that Western Southern stipulated to anything in that regard as to which law would apply. So our only question is procedural or substantive? The limitations is procedural. That's right. And that's Kayleigh's position and that it applies to any indebtedness that was secured by the real property and because Western Southern stipulated, not only in the pretrial order, that both the construction note and the mezz note were secured by the real property, that that issue has been foreclosed. In their discovery answers, response to request for stated that the deficiency, the mezzanine loan and the construction loan were secured by the same collateral. And then again in their April 1st, 2014 letter, which is at the ROA 6057, they state the deficiency amount is calculated by subtracting the value of the property at foreclosure from the total amount outstanding under the mezzanine loan and the construction loan. And so I think between their discovery answers and their stipulation in the pretrial order, there is not an issue about whether or not the guarantee of the mezz note and the construction loan were secured by the real property. Let me ask you, this is the language from what you're saying is the stipulation, that the mezzanine loan was secured by ownership interest in the construction project and intended development. Is that what you're talking about? That is not what I've just recited to the court. That is in there also and I believe I probably pointed that out in my brief. But specifically what I was at ROA 6080, Western Southern answered that they... 6080? Yes, your honor. Western Southern calculated the deficiency by subtracting the value of the property in December 2009 from the total outstanding, under the mezzanine loan and construction loan. And then they go on to state that the mezzanine loan and construction loan were secured by the same collateral. I will also... I was looking for the language and you were kind of getting soft there. It's secured by the same collateral. No, I heard you, but I'm just saying, is that the important language? No, I think the most important language is what's in the pretrial order where Western Southern states, and that's at ROA 1630, the construction loan promissory note and the mezzanine loan promissory note were each secured by a deed of trust. And a deed of trust of course covers real property. Was it the same deed of trust? There was only one deed of trust, your honor. And then I will also say, and this perhaps may be the most critical piece of evidence, is that the total indebtedness of just under the construction loan at the time of foreclosure was $24 million. And then there was roughly $5 million under the mezzanine loan. The fair market value of the property that was credited was $27.4. So that's roughly $3 million more than the total indebtedness under the construction note. And this came up at trial. I asked Mr. Roopsom, well, under the deed of trust, it states that if there's any excess from the fair market value over and above the indebtedness, shouldn't that money go back to the debtor? I think it was paragraph 6. I pointed out in my brief, I can't remember the paragraph, but it's in the deed of trust. It tells how the proceeds are applied. And he said, well, we applied it to the mezzanine note because they owed money under the mezzanine note. Well, you can't just apply it to a mezzanine note, which has a different borrower, just because they're all related unless they're all secured by the same property. And so we didn't challenge that. We didn't file any kind of a request for the $3 million to come back to Mr. Cayley as guarantor or to be applied because we agreed with their position that everything was covered by the real property. In fact, that issue came up briefly at trial and Judge Hittner said, Western Southern, you've pled the case that way. Your pleading is that way. You've tried it that way. All of your submissions have been that way. We're not going to let you change the story now. So we think that all of the indebtedness is covered by or was secured by the real property. So tell us what you would like us to do. I would like this court to reverse the district court's judgment, which was in favor of Western Southern, hold that both statute of limitations apply and bar Western Southern's cause of action and render judgment for Mr. Cayley that Western Southern take nothing. My next argument, Your Honor, Your Honors, is the application of Texas Civil Practices and Remedies Code section 16.004A3, and that is the Texas statute for suits on a debt. Judge Hittner did say, I'm not going to apply 51003A because I think it's substantive and it is 16.004A3. I will say that that's the applicable statute of limitations in this case. Judge Hittner then found, though, that the cause of action did not accrue until June of 2010 when Western Southern sent yet a third or fourth letter to Mr. Cayley. We believe the cause of action accrued on April 22, 2009, and the reason for that is on October 16th and 17th, Western Southern sent letters to the borrowers and copied Mr. Cayley, basically saying, you're in default. If the default's not cured, we're going to exercise our rights, including the right to declare the notes immediately due and payable. Admittedly, that's an optional acceleration clause, and had they not actually accelerated, we might not be here on that issue today. However, they did actually accelerate, and the evidence, I pointed out in my brief, but they started charging, the notes say that if the notes are declared immediately due and payable, then Western Southern can charge the default interest rate. They did that on the entire balance of both loans. They charged 20% on the mezzanine loan, and they charged 11%, which was the default rate versus the non-default rate of 6%. They started running the meter on April 22, 2009, so we believe they had to file suit under that section no later than April 22, 2013. They didn't file suit until June of 13, so we believe that that statute bars the entire cause of action as well. And I see that my time's about up, so I will thank you and wait for rebuttal. Thank you. Good morning, Your Honors. My name is Eric Richardson. I'm here with my colleague, Nathan Colvin. We represent the Plaintiff-Appley and Cross-Appellant Western Southern Life Assurance Company. I'd like to address some of the points that were just made by Ms. Hamrin on behalf of George Kaley. There was a statement made by Ms. Hamrin that Judge we had pled the case one way and he was not going to allow us to change it. That is not accurate, Your Honor. That discussion, I'm not sure what she's referring to, but that did not happen in any portion of this record. In fact, the Court made a finding that the mezzanine loan is secured by a pledge of the ownership interests in the borrowing entities on the mezzanine loan. That's finding of fact 14. It's a record on appeal 2773. Did you say it was, I mean, or did the joint pretrial order say that it was secured by the property? Your Honor. The deed of trust. Your Honor, that is a mistake. There was a mistake in the pretrial order. I'm sorry, not in the pretrial order. So the answer is yes, but it's a mistake. That's correct, Your Honor. It is stated accurately, I believe a few pages before that on ROA 1595, I think it's paragraph 10, where it states that it is actually, and this was also cited in our brief, but it's ROA 1595 paragraph 10 where we state that the mezzanine loan promissory note was secured by a pledge of ownership interests in the borrowers of the mezzanine loan promissory note. Both sides, Your Honor, I believe have been liable for was secured by a pledge of the borrower's interests. Mr. Cayley actually admitted that also at paragraph 11 of his answer at the very outset of the case. I believe that both sides had been imprecise with regard to that. The documents themselves, they were crystal clear, Your Honor, here, and they were cited by Judge Hittner in support of paragraph 14 of his findings of fact, where he cites the mezzanine loan, the amendment to the mezzanine loan, and then the for the mezzanine loan. Your Honor, it just made sense because there were three special purpose entities created here. One entity was created to hold the property and to be the borrower on the construction loan. That was Sedona Apartments LP. There were two different entities that were created to actually own Sedona Apartments LP. Those two entities, it was Sedona Apartments GP, LLC, and Sedona Apartments Investors. I apologize for the very similar names, but it was the way that it was set up. So the mezzanine borrowers did not own the real property. They owned the owner of the real property. They did not have an interest in the real property to deed outright or to pledge as security for the mezzanine loan because they themselves did not own it. Their security for the mezzanine loan was simply a pledge of the ownership interests in those entities themselves. Ms. Hamrin had also mentioned the fact that, well, if the fair market value of the property was $27,400,000, why wouldn't there have been some credit that would have gone to Mr. Cayley? The foreclosure on the real property occurred on December 1st of 2009. Two months earlier, Western Southern had already foreclosed on the mezzanine loan on September 28th. So at that point in time, if there was a surplus, it would have gone to the borrowers at that point in time. It would not have gone to a guarantor. It would have gone, theoretically, to Sedona Apartments LP that owned the land or its owners. At that point, Western Southern was the owners. Any surplus would have gone to Western Southern because it had already foreclosed on the owning entities. Western Southern did not simply pocket that or take that and say that it wasn't going to give credit. In its damages, it gave Mr. Cayley credit for the additional surplus. And again, this is all on paper. Nobody actually bid at the non-judicial foreclosure other than There was a subsequent calculation that was done that there was a fair market value for the land of approximately $27,000. And that was how we booked it against the debt we were going to go against the guarantors. So for Ms. Hamren to say that, well, it was clear from the beginning that the mezzanine loan was, in fact, secured by real property, as I said, there was a mistake that we made in a pretrial brief that was corrected a few pages before that or stated accurately a few pages before that. Mr. Cayley actually admitted in his answer that the mezzanine loan was secured by a pledge of the borrower's interests. Do you agree with finding of fact 14? You're telling us that's how we should look at this? Yes, Your Honor. I would say that's a finding of fact here that cannot be disturbed unless it's clearly erroneous. It cannot be deemed to be clearly erroneous because all of the documents, in fact, demonstrate that that was the way that it was actually Okay. Well, then what do you do if you lose on the procedural substantive argument? Well, Your Honor, that actually, first, if it's procedural or substantive, we have argued in our brief that it is substantive. Right. Assume you lose on that argument. Well, then, Your Honor, then it goes to, within this, there's the waiver. Mr. Cayley actually waived, as a guarantor, any right of set-off, which, as we've cited, I think it's the Nussbaum case. Assume you lose that and you're going to lose on part of the case, at least. All right. What do we do with it? Yes, Your Honor. It goes from that it is procedural versus substantive, but there is a waiver, and then the only thing 51003 can apply to is going to be that debt that is secured by real property. As we say, the court found that the mezzanine loan was not, and all of our items of damages are recoverable independently on the mezzanine loan and the completion guarantee. The completion guarantee was not tied to any debt secured by real property, nor does Ms. Hamron argue otherwise. The completion guarantee gave us recovery of the lien amounts, and it was the only one to do so, and as a result of that, that amount should survive in this case regardless of anything else. Okay. I guess I'm asking, what do we do with the case? Do we, you've got claims, they've, what happens to the case under your, just like I asked the other side, it wants to render? Your Honor, we believe that the judgment in favor of Western Southern should be affirmed. The folding that it is timely should be affirmed. We have asked for two additional items of damages that we have argued should have additionally been granted by Judge Hittner. So we would... I'm assuming that you're going to lose on, just arguendo, I'm not saying that you actually are. If you lose on the first part that was secured by the deed of trust and it's two years problem, and you lose that part, what do we do with the rest of the case? Your Honor... To tie it up. Sure. How do we render a proper judgment, or do we remand? What do we do? The remaining damages should be affirmed that Judge Hittner granted, because they are not a deficiency, and we have cited the case law for that. So it would be the 2.5 million dollar balance on the mezzanine loan. If this court concludes that Judge Hittner clearly erred and that it was secured by real property, the 2.5 million dollar balance, I think, would then be time barred by 51003. But the remaining 1.3 million in damages, which were a combination of the liens, the unpaid real estate taxes, a portion for the attorney fees, and our other enumerated damages, those are not part of the deficiency. The sole case, S-O-W-E-L-L, identifies the calculation that a deficiency is simply the unpaid loan balance minus the value of the property. Any other damages, in that case they had real estate taxes, those were not included within the definition of deficiency. Do we have to remand it because there are all these other, these fees and things, and they may not be awardable? Your Honor, I think on our cross appeal with regard to construction defect costs and the attorney fees, that the case at that point could be remanded to Judge Hittner to consider beyond the legal impediments that he believed existed, which we believe do not, to the award of those. He could consider then what is a reasonable attorney fees with regard to our cross appeal. So we believe that a remand for the district court to then consider what attorney fees are reasonable, and then also the construction costs to be able to enter judgment on that. But also the fees you already got might be different. That's true, Your Honor, that's true. He had awarded, he had directed us at trial when we asked for an opportunity to supplement our fees for the time that had not been reduced to a statement. We asked for the opportunity to do that under Rule 54. He withheld ruling on whether we could do that or not, and it was opposed by Mr. Cayley. The court, I think on the third day of trial, then directed us to go ahead and present testimony regarding what we had incurred since the time, or an estimate of what time had been incurred since the last statement had been issued before trial. Okay, but you might get less though if you lose on the, because you're the appellate fees have actually been more than what we have, that we had estimated at trial. So I don't believe that that category anyway, Your Honor, would be less. Of the total attorney fees, it was approximately $900,000 for three firms. The court ended up awarding approximately $40,000, which was just the fees that had been estimated for the appeal. Okay, and we can't sort that all out. I would say that Your Honors would remand on the cross appeal for consideration by Judge Hittner in connection with what is a reasonable amount of fees on that and the other categories for the appellate, or I'm sorry, for the attorney fees, and then the construction defect costs. If I may, Your Honor, with regard to some of the additional ones, I believe Judge Southwick had put his finger on it as well. The other items where Ms. Hamrin has identified as supposedly some stipulation, it actually is stated that the mezzanine loan was secured by an ownership interest. As I conceded previously, I think both sides have been imprecise sometimes with the language before that issue I think crystallized. But the documents themselves are clear in terms of what the actual security is. With regard to the substantive versus procedural issue, Your Honor, as well, we do cite the Chase Manhattan Bank versus Greenbrier case. That is a case where the Texas Court of Appeals did consider a time limitation where there was a New York choice of law provision. The court there then looked at the New York statute for deficiency to try to determine whether or not the time limitation there could be characterized as procedural or substantive, ultimately concluded that it was a substantive provision because it was a unified statutory scheme. It was integral, ultimately, the different provisions to the creation there of the rights and affirmative defenses. But notably, in New York, the right to a deficiency preexisted that statute. It is not as limited as Ms. Hamrin has stated with regard to the Hill versus Perel case. Certainly, if a statute of limitations is included within the statute that creates the cause of action, that statute of limitations can be said to be substantive. But it is not that limited, that it can be substantive in other situations such as Chase Manhattan Bank where there was a time limitation that had to be taken in order for a lender to be able to proceed to try to recover a deficiency. And it was a 90-day, very short time turnaround to be able to move for a determination of the fair market value following the foreclosure. At that point in time, the Texas Court of Appeals concluded that the way this statute was put together, that you could not cherry pick one portion of it from another to be able to then say, well, the statute of limitations is entirely procedural or any limitations period is procedural. They concluded that the time limitation was, in fact, substantive. We would submit that here, with regard to 51003A, that it does far more than even the Trunk Hill case that she cited did. Trunk Hill proceeded on the misunderstanding that the statute only governed rights that existed at common law. Even if the right to a deficiency existed before the enactment of 51003, the Moyetti case, M-O-A-Y-E-D-I, from the Texas Supreme Court in 2014 held that 51003 created a borrower and a guarantor under Texas law. The Plains Hills case also came up and said that it created an affirmative defense, that the rest of the statutory scheme sets out a somewhat complex series of how you determine a fair market value, what evidence is relevant with regard to that procedure, in addition to creating the rights themselves. We assert, Your Honor, as we set of Ohio law, when you consider the waiver that Mr. Kaley executed, that he was waiving the right of set-off, which has been concluded to be the same as waiving the right of 51003, and again, I think it's the Nussbaum case, that there would be nothing left other than the two-year statute limitations they're trying to apply. And we believe that at that point, Your Honor, it doesn't make sense to try to cherry-pick from that, that the statute has to be seen as a unified statutory scheme that can't be applied piecemeal as a result. Then you also have the Siegel case, which they cite and we do as well, and the Soule case, where they do deal with looking at the rights under 51003 and conclude that the right of offset is a substantive right. The statute does create substantive rights with regard to the analysis here, which we believe also carries over that you cannot excise one portion and try to apply it piecemeal otherwise. Just briefly, Your Honors, also with regard to the waiver argument, they argue that the waiver provision is inapplicable because of the way that it's framed. I believe that the language is somewhat odd, that it says that the guarantor agrees that he will not assert any rights that the borrower had against the lender or that the guarantor has against the borrower. That same kind of construction was considered by this Court in the LaSalle Bank matter. In that matter, this Court held that, well, where the lender's rights are the same or would be shared with the guarantor, such as 51003, that it is an effective waiver of rights that the guarantor might also assert against the lender, even if they happen to overlap with what the borrower would do. We believe that's the appropriate construction here, and we cited that for the Court in our brief. With regard also, Your Honor, with regard to the cross appeal, as I indicated, I believe remand is appropriate there. With regard to the attorney fees, Judge Hittner directed us to present evidence at trial with regard to the calculation. We were the only ones who presented testimony or documents regarding it. We had statements on a monthly basis for the Voorhees firm, my firm. We also had summaries with regard to the statements that were submitted by Baker Botts and also by another firm, Frost, Brown, Todd, that had been involved, and that was undisputed by any other testimony or evidence in terms of the amount that was incurred. We had my colleague, who was admitted as an expert witness, to be able to testify regarding the reasonableness of the fees. Consistent with Ohio law, he calculated what was a reasonable hourly rate based upon published rates from the Texas and Ohio bars, and then a reasonable number of hours, and because those amounts fell within that, he concluded that it was reasonable. Again, there was no other testimony regarding that. With regard to the construction defect costs, we believe that Judge Hittner was unduly restrictive with regard to that particular item. On construction defect costs, he looked solely at what items were covered by the plans and specifications. In fact, the language is broader than that in the guarantee, in the completion guarantee, and it actually covers anything that would be identified in the plans and specifications or otherwise required by the construction loan agreement, and the construction loan agreement here required that the property be completed as a Class A development. Our expert, Kelly McGee, who had been a principal at Graystar Property Development, also was admitted as an expert without objection for Mr. Cayley. He testified that all of the items that were done were necessary to be able to complete this project as a Class A development, and that was approximately $619,000 in costs there. Were there issues regarding when these defects or deficiencies occurred, and are you seeking recovery and compensation for remediation, completion of things that may have arisen after you took control of the property? No, Your Honor, we are not. We have identified where Mr. McGee, our expert on this issue, had identified items that had arisen or incomplete construction. By definition, incomplete construction is something that they had not done before we took possession. Is there at least a limit to part of what you said? It seems to me that you're acknowledging a limit that whatever the completion costs are in the future incurred according to this provision, you are at least limited to what the original plans were, or I mean, I can see if you want to get to whatever you call it, a Class A or something else category for this development, this could get quite expensive under this somewhat open-ended provision. The sum total we are seeking, Your Honor, is the $619,000, and that is the complete amount that was necessary to be able to provide furniture, which was an item also in the construction loan agreement we cited in our brief, to be able to complete construction, repair the pool decking. This place was essentially left undone and allowed to be vandalized once Mr. Cayley and his partner realized they weren't going to be able to bring the loan current. As a result, it was essentially left to rot. That was the words that were used by Judge Hittner during the trial, during the time. But we had a property inspection report which we have cited, which establishes the condition of the property as of September 3rd of 2009, Your Honor, and that identifies all of these items for which we ultimately had this done. Was that inspection done at that time, or is that retrospective? No, it was done in August, Your Honor. It was done at the very end of August. The report was issued on September 3rd, and that was before Mr. McGee's firm came in and reassessed in December and found that, of course, that it was comparable levels when he was trying to figure out everything he was going to have to finish. I see that my time's expired. If I may say one thing on acceleration, the district court also made a finding on when acceleration actually happened. Although Ms. Hamrin states that acceleration occurred in April of 2009, actually the letter on the mezzanine loan says that the lender may exercise its rights, not that it shall. On the construction loan, it says that if unless this is brought current, they shall. But within a week, Mr. Koehling and his partner asked us to forbear from doing that to try to work out an agreement, which we did. And the district court ultimately concluded that acceleration did not, in fact, occur until August 11th of 2009. That's at finding of fact 23, ROA 2775. So I would ask that the holding that the suit was timely in judgment in favor of Western Southern be affirmed, and on the cross appeal that those issues be remanded to Judge Hittner for entry of some amount for reasonable fees and construction costs. Thank you, Your Honors. Thank you. Your Honors, with respect to counsel's statement that Mr. Koehling admitted in his answer that the mezzanine loan was not secured by the deed of trust, that is simply not the case. I believe counsel cites to paragraph 11 of the amended answer. I'm not sure if counsel is referring to the original answer or the amended. The amended was filed approximately two weeks later. But paragraph 11 of the answer simply admits what paragraph 11 of the complaint is. And paragraph 11 of the complaint states, accordingly, Western Southern agreed in November 2006 to extend two years of the Meritized Project. The loans were made between Western Southern and several special purpose entities, ownership entities, of which Koehling was an owner and or investor. The loans were secured by Koehling's personal guarantees as well as by Buchanan and by a security interest in the ownership interest that controlled the Meritized Project. That is different. That paragraph doesn't state that the mezzanine loan was only secured by the ownership entities. We believe it was secured by the ownership entities and the deed of trust. And with respect to counsel's statement that what's in his pretrial order was a mistake, this is the first time I have heard that. That is not in his briefs. And it's binding. The case was tried as if that being the case. Well, what about finding of fact 14? I don't believe finding of fact 14, I don't believe that when the judge made findings of fact, he said, I don't think it was done with the intention of, he didn't say it's only secured by the ownership entities because it wasn't relevant to his findings. The only reason why Judge Hittner held that 5103A didn't apply was because he felt it was a substantive statute. He didn't say that, again, it wasn't tried that way. And not only the pretrial and the discovery, but the loan documents themselves basically say that the deed of trust and the interest in the real property secures any and all loans with respect to the project. And that is at the counsel table. I believe I cited in my brief, but the deed of trust states that this deed of trust secures all loans related to the project. And then the mezzanine loan, as the complaint states, there were two loans related to the project. So I think Western Southern was well within its rights to apply the proceeds from the fair market value of the foreclosure of the real property to both loans because the owner of that property agreed that all loans related to the project were secured by that deed of trust. Now with respect to the other items, the taxes, the insurance, the deed of trust also secures those items. So they too are subject to 51003A. And I've stated in my brief the specific sections of the deed of trust. We argued that at trial we submitted findings of fact on that. There's very specific sections in the deed of trust that's very standard for a deed of trust to say this secures not only taxes, insurance, I think there were rents, missing security deposits, which was one of the items that the judge awarded to Western Southern. All of those additional items were all mentioned in the deed of trust as being secured by the deed of trust. And that applies also to the attorney's fees for the Baker Botts firm, which conducted the foreclosure. The deed of trust states that it secures all attorney's fees in connection with the foreclosure. We believe those attorney's fees would be barred by limitations also. Same thing with the foreclosure on the security interest, which is the additional security for the Mez loan. Now this court recognized in the LaSalle case back in 2002 that in 1991 when the Texas legislature adopted 51003 and the heading in the property code is deficiency judgment, it's not really an anti-deficiency statute like some of the other states have. One of those other states is the Chase case, which Western Southern relies on. The Segal case, which is a Houston court of appeals case, specifically talked about the 90-day window under New York law and said, yes, that is substantive under New York law because what New York law requires is that if a creditor forecloses, within 90 days they have to file a motion with the court asking for an order of deficiency. Otherwise, the fair market value is presumed to be the amount of the debt and you can't go forward after that and file a suit for that. Mr. Southwick had a question for you. I have a comment. You've sat through some of the earlier arguments today and we've sat through all of them. This is the only case we've had where each side has accused the other of not being totally candid. This may be the highest value case. It may be the one strictly commercial case we have. It's troubling. I don't mean anything disrespectful to Mr. Richardson. I'm just saying each of you have done that and we'll have to sort out where the answers are, but we look for the evidence to be able to inform us. Instead, at times it has not informed us because of these different statements about what's really in the record. That's all I have. Your Honor, I apologize. I didn't mean any disrespect to Mr. Richardson. He's a fine lawyer. I was simply trying to argue that my version of what the facts are in the cases is different than his version, but no disrespect. No disrespect. I'm not looking for concern or respect shown from the other, but there is allegations both ways of a lack of us getting the right information outside. Enough said. Thank you. Thank you. This concludes the argument in this case. The case is submitted. The court will stand adjourned pursuant to the usual order. Thank you.